UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

KIM RENEE ROBERTSON,                    )
                                        )
                Plaintiff,              )
                                        )          No. 2:11-cv-286
v.                                      )
                                        )          *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY,        )
                                        )
                Defendant.              )

<u>**REPORT AND RECOMMENDATION**</u>

Plaintiff Kim Renee Robertson brought this action pursuant to 42 U.S.C. §§ 405(g) seeking

judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying her supplemental security income ("SSI") and disability insurance benefits

("DIB"). Plaintiff has moved for judgment on the pleadings and Defendant has moved for summary

judgment [Docs. 13, 17]. Plaintiff alleges the Administrative Law Judge ("ALJ") failed to properly

consider her fibromyalgia and the totality of her impairments when he determined she could return

to her past relevant work and failed to properly weigh the opinion of a consulting psychologist. For

the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings

[Doc. 13] be **DENIED**; (2) the Commissioner's motion for summary judgment [Doc. 17] be

**GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

I.      **ADMINISTRATIVE PROCEEDINGS**

Plaintiff initially filed her applications for SSI and DIB on May 29, 2009, alleging disability

as of December 21, 2007 (Transcript ("Tr.") 105-18). Plaintiff's claim was denied initially and upon

reconsideration and she requested a hearing before the ALJ (Tr. 64-88). The ALJ held a hearing on

November 19, 2010, during which Plaintiff was represented by an attorney (Tr. 25-40). The ALJ

issued his decision on December 29, 2010 and determined Plaintiff was not disabled because she could return to her past relevant work and, in the alternative, there were jobs in significant numbers in the national economy that Plaintiff could perform (Tr. 7-20). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-3). Plaintiff filed the instant action on September 29, 2011 [Doc. 1].

## II. FACTUAL BACKGROUND

### A. Education and Background

Plaintiff was 48 at the date of the hearing and the ALJ's decision (Tr. 28). She had graduated high school and had previously worked as a nursing home housekeeper, a hotel reservation clerk, a convenience store cashier, and the owner of a construction company (Tr. 29). Plaintiff testified that rheumatoid arthritis and fibromyalgia made it difficult for her to complete easy tasks or stand on her feet for any period of time; these conditions also made sitting or standing uncomfortable (Tr. 30-31). Plaintiff also suffered from neuropathy, asthma, depression, panic attacks, anxiety, and low back pain (Tr. 31). Plaintiff took narcotic pain medications and received steroid injections in her spine when she had insurance (Tr. 31). Plaintiff's doctors had never indicated she needed surgery for her physical problems, but she testified her doctors told her not to lift anything and stay off her feet as much as possible (Tr. 31-32). Plaintiff further testified that she did not have a full range of motion in her arms and would be unable to lift or carry any amount of weight on an occasional basis (Tr. 32). Plaintiff testified to many limitations in the use of her hands because they became swollen and her fingers would draw up (Tr. 35). She stated she could not lift a gallon of milk with one hand and had problems with buttons (Tr. 36). Plaintiff was taking Plaquenil, which had affected her eyesight and she now had to wear glasses; she had taken Methotrexate in the past but it made her

2

confused and sick (Tr. 35). Plaintiff stated she would not be able to stand or walk at a job for six hours out of eight hours and could only stand for about five minutes at a time for a maximum of less than two hours; if she were sitting, she would have a difficult time getting back up due to "gelling" and would be able to sit for less than two hours during an eight hour day (Tr. 32).

Plaintiff took two medications daily for her depression and anxiety and was supposed to attend therapy, but was unable to go because she did not have insurance (Tr. 34). Plaintiff testified that she had a very hard time concentrating and also found it difficult to leave her house (Tr. 34). Plaintiff lived with her adult son, who did most of the cooking and cleaning; she also had a friend come over once a week to clean her floors and bathrooms and her friend did the grocery shopping and clothes shopping for Plaintiff (Tr. 33-34). Plaintiff did not do any outside chores or yard work (Tr. 34).

### B. Vocational Expert Testimony

The ALJ first asked the vocational expert ("VE") to consider an individual who could perform light work but could not climb ladders, ropes or scaffolds, could perform fine manipulation no more than occasionally, was not exposed to pulmonary irritants, would only perform simple, routine, repetitive tasks and could maintain concentration and persistence for such tasks, and could adapt to only gradual and infrequent change in a work setting (Tr. 37-38). The VE testified that if Plaintiff had those limitations, she would be able to return to her past work as a cashier or as a sole proprietor of a construction company (Tr. 38). The ALJ next asked the VE to consider whether an individual with the same limitations could perform any other work in the national economy (Tr. 38). The VE testified that an individual with these limitations could work as a hand packager, with 500 jobs in the region and 700,000 nationally; a sorter, with 425 jobs in the region and 450,000

3

nationally; an inspector, with 275 jobs regionally and 235,000 nationally; or an assembler, with 200 jobs in the region and 375,000 nationally (Tr. 38).

Next, the ALJ asked the VE whether Plaintiff would be able to perform any of her past jobs or any work in the national economy if Plaintiff's testimony and presentation was entirely credible, her mental limitations were the same as in the first hypothetical question, and the ALJ found she was incapable of working at any exertional level on a consistent basis for eight hours a day, forty hours a week (Tr. 38-39). The VE testified that an individual with those limitations would not be able to return to past work or perform any work in the national economy (Tr. 39). Plaintiff's attorney asked the VE to consider an individual with the limitations outlined in the ALJ's first hypothetical question, but with the additional limitation that the individual could only occasionally grasp (Tr. 39). The VE testified that the additional limitation would eliminate all jobs (Tr. 39).

### C.    Medical Records

Notes from Medical Care, LLC on May 25, 2004 indicate Plaintiff complained of pain in different areas of her body, a swollen right wrist, pain in her shoulder, and pain and tenderness in her ankles (Tr. 418-19). Plaintiff's right hand and wrist were significantly swollen and tender and there was no range of movement; there was also tenderness in her upper arm, shoulder, and left achilles area (Tr. 418-19). On June 21, 2004, Plaintiff complained of depression, joint pain in her right arm, both heels, and hip, and neck pain (Tr. 420-21). Plaintiff was prescribed Prednisone, Celebrex and Wellbutrin (Tr. 421). Plaintiff returned to Medical Care, LLC on August 13, 2004 and complained of a throbbing chronic headache, joint pain in her feet, ankles, arms and wrists; she reported another doctor had diagnosed her with fibromyalgia (Tr. 422-24). Plaintiff did not have obvious swelling in her joints but she did have a reduced range of motion; she was referred to Dr.

4

Lurie for her rheumatoid arthritis ("RA") (Tr. 423). Plaintiff followed up on August 16, 2004 and reported that Wellbutrin made her heart race and chest hurt, but Celebrex had helped with her RA symptoms (Tr. 425-26). On August 31, 2004, Plaintiff returned to follow up and it was noted that her depression, elevated blood pressure, insomnia, and back pain were all getting worse (Tr. 427-28). Plaintiff was advised to lose weight and stop smoking (Tr. 428). A bone survey and scans of Plaintiff's wrists, hands and feet on September 13, 2004 were all normal (Tr. 367-73).

Plaintiff saw Dr. Lurie on March 24, 2005 continuing to complain of fatigue and depression, but reported improvement in her pain and swelling with Salsalate and Plaquenil (Tr. 183). Dr. Lurie identified no objective soft tissue swelling, an improvement from the last exam, and minimal trace synovial thickening in some joints (Tr. 183). Dr. Lurie noted a diagnosis of RA with minimal palpable synovitis on low intensity therapy (Tr. 183). Plaintiff saw Dr. Lurie on July 24, 2006 for a followup on her RA (Tr. 179-80). Plaintiff complained of soft tissue swelling in her hands, ankles, and feet, cramping discomfort with hand use, and numbness (Tr. 179). On examination, Dr. Lurie noted Plaintiff had reduced grips and minimal synovial thickening in the wrists but no palpable synovial thickening or effusion elsewhere (Tr. 179). Plaintiff had numerous tender points (Tr. 179). Dr. Lurie noted Plaintiff's symptoms were out of proportion to the objective findings of synovitis by exam, and he was reluctant to intensify treatment (Tr. 180).

Plaintiff had scans of her wrists and hands on October 17, 2006 which showed normal alignment with no osteophytes, erosions, or soft tissue calcifications; no significant abnormality was identified (Tr. 204-07). Scans of Plaintiff's feet and ankles also revealed no significant abnormalities (Tr. 208-09, 211-12). Plaintiff's chest was also normal (Tr. 210). Plaintiff returned to Dr. Lurie on May 18, 2007, and Dr. Lurie again noted mildly reduced grips and minimal wrist

5

limitations (Tr. 181-82, 385-86). Dr. Lurie noted Plaintiff walked with an antalgic gait and that assessment was difficult due to numerous and widespread tender points (Tr. 181, 385). Plaintiff's optometrist opined that Plaintiff's Plaquenil medication was not adversely affecting her eyes or vision on April 24, 2008 (Tr. 383, 526).

Scans of Plaintiff's right foot on May 5, 2008 revealed exostosis and a possible benign cyst (Tr. 267, 366). Plaintiff had an MRI of her lumbar spine on September 30, 2008, which indicated varying degrees of degenerative changes, including partial desiccation, slight disc narrowing, and minimal edema (Tr. 249-50, 363-64). Plaintiff followed at Appalachian Medical Center from early 2007 through 2009 to address COPD and other problems; she reported a long history of chronic bronchitis with cough and congestion and back pain (Tr. 305-16, 319-44). She reported problems with anxiety and stated her anxiety was caused by social stressors, family problems, and financial/work stressors, but sometimes happened for no reason; she also reported symptoms of depression in May and June 2009 but stated they were well controlled with medications (Tr. 305-16).

Plaintiff began treatment with Pain Medicine Associates, P.C. ("PMA") in October 2008 (Tr. 224-28). Plaintiff reported chronic low back pain and pain related to RA, as diagnosed by Dr. Lurie (Tr. 224-25). Physician assistant John Powell noted Plaintiff's lumbar MRI revealed some disc bulges and her pain was multi-factorial secondary to RA (Tr. 224-25). PA Powell noted that there was no obvious synovitis but her small joints of the hands and fingers were painful with limited range of motion and limited grip (Tr. 224-25). Plaintiff returned for a follow up on November 5, 2008 complaining that her new pain medication was not helping; PA Powell increased the dosage and scheduled her for a psychological evaluation (Tr. 223). Plaintiff had lumbar epidural steroid

6

injections on November 17 and December 31, 2008 (Tr. 222). On December 10, 2008, Plaintiff had a psychological pain evaluation by Dr. C. Marcus Cooper and was diagnosed with a mood disorder due to her general medical condition, fibromyalgia, RA, and lumbar degenerative disc disease (Tr. 570-71). Dr. Cooper noted that Plaintiff was experiencing some symptoms of depression and anxiety (Tr. 571).

Plaintiff returned to PMA on June 5, 2009 and PA Powell noted Plaintiff spoke of chronic depression and stayed at home in bed much of the time; she was discouraged with her current situation in life (Tr. 220). PA Powell instructed Plaintiff to have a cervical MRI performed; Plaintiff had this done on January 13, 2009 and the MRI was unremarkable and no abnormalities were identified (Tr. 220, 248, 362). On January 28, 2009, Plaintiff's depression had improved and her medication seemed to be working well (Tr. 219). Her cervical MRI was normal and she did not need any epidural injections (Tr. 219). PA Powell noted Plaintiff requested the facet blocks she got on December 31, but he felt it was too early to repeat this surgical procedure, although she could benefit from trigger point injections (Tr. 219). Plaintiff had trigger point injections on February 18, 2009 and returned for follow up visits on February 25 and April 8 (Tr. 216-18).

Plaintiff had a left hip injection to treat her bursitis on April 27, 2009 (Tr. 215). Plaintiff reported to PMA on May 6, 2009 to follow up on her low back pain, RA, and bursitis (Tr. 214). It was noted that the clinic had no records supporting her diagnosis of RA and PA Powell could not confirm any synovitis or RA changes (Tr. 214). Plaintiff returned to PMA on June 3, 2009 for refills on her prescriptions for pain management, and it was noted that the clinic did not have records from Plaintiff's other physicians to make a full diagnosis (Tr. 213). PA Powell noted low back pain, generalized fibromyalgia, and possible RA (Tr. 213).

Plaintiff tested positive for Hepatitis C on May 11, 2009 but a further analysis was indeterminable (Tr. 274, 475). Plaintiff had a scan of her whole body performed on May 11, 2009 which showed normal results (Tr. 243, 286, 483). Scans of her hands and back were also normal (Tr. 244-46, 290-95, 484-86). A scan of Plaintiff's chest revealed no acute pulmonary or pleural disease (Tr. 247, 288, 487). A CT scan of Plaintiff's abdomen performed June 6, 2009 revealed probable gallbladder stones but no appendicitis and no explanation for Plaintiff's right-sided pain (Tr. 284). Plaintiff presented to Dr. Aqueel Kouser with Healthstar Physicians on May 4, 2009 and reported diagnoses of RA and fibromyalgia (Tr. 448-51, 471-72). Plaintiff told Dr. Kouser she had been hurting all over for the past five years and she was having trouble with activities of daily living; she stayed tired and fatigued and was depressed and anxious (Tr. 448). Plaintiff reported weight gain from steroid medication and problems with methotrexate for her RA; she was on Plaquenil, which helped to a degree (Tr. 448). Dr. Kouser noted Plaintiff had paracervical muscle tenderness, full range of motion in her shoulders and elbows, no synovitis in her wrists and hands, and some crepitations to the knees (Tr. 449). Plaintiff had a follow up visit on May 29, 2009 and complained of pain; her lab work was consistent with RA but her hepatitis C tests were questionable (Tr. 446-47, 470). A hepatitis C test done June 4, 2009 appeared negative (Tr. 474).

On June 29, 2009, Plaintiff submitted to a sleep study (Tr. 488-91). The study revealed no respiratory abnormalities during sleep and there was no need for a CPAP trial; however, Plaintiff did have some insignificant sleep disorder breathing (Tr. 489). Plaintiff returned to Healthstar Physicians and saw nurse practitioner Sharon Wilder on July 28, 2009 complaining of pain in her hands and various other problems; Ms. Wilder noted swelling at various joints and redness and inflammation of a joint in the right hand (Tr. 443-45, 468-69). Plaintiff had mild crepitus in her

8

knees and a limited range of motion in her wrists (Tr. 443). Ms. Wilder noted that Humira was not necessary because Plaintiff's arthritis was mild and was not causing any significant synovitis (Tr. 443). Dr. Aqueel Kouser agreed with Ms. Wilder's assessment and signed off on her notes (Tr. 443-44).

On September 17, 2009, Dr. James Millis filled out a medical consultant analysis form to review the ALJ's prior decision of December 20, 2007 with current findings for Plaintiff (Tr. 453-56). Dr. Millis stated the records did not establish any improvement or worsening of Plaintiff's motor function due to RA or fibromyalgia, and there was also no significant change in Plaintiff's breathing ability due to asthma (Tr. 454). Dr. Millis also filled out a physical residual functional capacity assessment and indicated Plaintiff could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk for about six hours in an eight-hour day, sit for about six hours in an eight-hour day, and was unlimited in her ability to push and/or pull (Tr. 457-65). Dr. Millis further opined Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation due to her asthma (Tr. 461). Dr. Millis noted that Plaintiff's statements were partially credible because her recent examination showed no significant deficits in motor functions that would be in line with Plaintiff's complaints of pain (Tr. 462). Dr. Millis further noted that he was adopting the limitations applicable to the ALJ's prior decision because there was no indication of improvement or worsening of Plaintiff's conditions (Tr. 464).

Plaintiff continued to follow with PMA through October 2009 and received trigger point injections and medication refills (Tr. 521-24). On June 26, 2009, PA Powell noted that he had never been able to confirm her synovitis or rheumatoid deformities, and on August 3, 2009, he noted there was no evidence of synovitis (Tr. 522-23). On October 2, 2009, PA Powell wrote that he still

9

needed a confirmation that Plaintiff suffered from RA because he had no laboratory tests or physician records confirming the diagnosis (Tr. 521).

Plaintiff returned to Ms. Wilder and Dr. Kouser on October 7, 2009 seeking documentation of her RA and fibromyalgia to be sent to her pain specialist and orthotics due to pain in her feet that could be attributable to neuropathy or plantar fascitis (Tr. 466-67). Plaintiff was not experiencing back pain but had a limited range of motion in her shoulders and pain and tenderness around her trapezius (Tr. 466). Plaintiff's wrist flexion was somewhat limited and there was slight swelling of her wrists, joints and fingers (Tr. 466).

On October 11, 2009, Plaintiff submitted to a psychological examination by Dr. Charlton Stanley (Tr. 492-96). Plaintiff reported having problems sleeping; she trembled visibly and was extremely fidgety and restless and her anxiety seemed to be between moderate and severe (Tr. 495). She reported being depressed for a long time and experienced fatigue, difficulty concentrating, feelings of hopelessness, irritability, and crying (Tr. 495). Plaintiff had infrequent panic attacks and she seemed to be developing agoraphobia (Tr. 495). Plaintiff reported being unable to sweep and mop her home and shopping was difficult because she had to take Xanax before leaving the house (Tr. 495). Plaintiff spent much of her time reading and watching TV; she had a couple of friends who would drop by to visit but she did not visit them (Tr. 495). Plaintiff would stay in her bedroom with the blinds drawn on a bad day and would read and watch TV on a good day (Tr. 495). Dr. Stanley indicated Plaintiff was able to understand simple information or directions, but it was extremely hard for her to stay on topic; her ability to maintain persistence and concentration on task for a full workday and workweek was poor because she had difficulty focusing on a single question and giving a complete answer; and her social relationships were moderately to severely impaired

10

because she did not go anywhere and had difficulties meeting new people (Tr. 496). Plaintiff was diagnosed with agoraphobia, generalized anxiety disorder, and dysthymic disorder and Dr. Stanley assigned her a Global Assessment of Functioning ("GAF")[1] score of 50 (Tr. 496).

Dr. Larry Welch filled out a medical consultant analysis form on October 29, 2009 (Tr. 498-501). Dr. Welch opined Plaintiff's mental conditions had worsened and she was unable to work on a continuing basis with the general public (Tr. 499). Dr. Welch's psychiatric review technique noted Plaintiff's dysthymic disorder and agoraphobia and opined Plaintiff would have moderate limitations in maintaining social functioning, concentration, persistence, or pace and would have mild limitations in activities of daily living (Tr. 502-15). Dr. Welch opined Plaintiff was experiencing more problems with anxiety than at the time of the ALJ's decision, indicating a significant change in her diagnoses, symptoms and functioning, and she could not work on an ongoing basis with the general public (Tr. 514). Dr. Welch noted that Plaintiff's conditions were serious but fell short of meeting the requirements of any listing (Tr. 514).

Dr. Welch also filled out a mental residual functional capacity assessment in which he opined Plaintiff was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek

---

[1] A GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basis standards of neatness and cleanliness; respond appropriately to changes in the work setting; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others (Tr. 516-17). Plaintiff was markedly limited in her ability to interact appropriately with the general public (Tr. 517). Dr. Welch opined Plaintiff could understand and remember simple and detailed instructions, could focus and concentrate on a task for at least two hours at a time without distraction or need for special supervision, could interact appropriately with peers and supervisors, and could adapt to routine workplace changes, travel independently, avoid normal hazards, and set and carry out realistic goals (Tr. 518). Dr. Andrew Phay confirmed Dr. Welch's assessment on January 11, 2010 (Tr. 533).

On March 25, 2010, Dr. Nathaniel Robinson filled out a physical residual functional capacity assessment (Tr. 534-42). Dr. Robinson opined Plaintiff had the same restrictions on lifting, standing/walking, sitting, and exposure to fumes, odors, dusts, and gases as Dr. Millis opined in his assessment (Tr. 535, 538). Dr. Robinson further opined Plaintiff should never climb ladders, ropes, or scaffolds, but had no other limitations (Tr. 536-38). Dr. Robinson noted there was no definitive diagnosis of fibromyalgia in the records, Plaintiff's RA appeared to be controlled with medication, and some of Plaintiff's other complaints (neuropathy, asthma, hepatitis C) were not well documented in the record or seemed to be well controlled (Tr. 541). Dr. Robinson noted Plaintiff's x-rays were consistently normal and unremarkable and opined Plaintiff's complaints were partially credible and she could perform medium work (Tr. 541).

Plaintiff continued to follow with PMA in 2010 and it was noted on May 12 and June 11 that Plaintiff had no obvious synovitis (Tr. 575-76, 579). Plaintiff returned to PMA on July 12 and August 11, 2010 and PA Powell noted he needed updated records concerning Plaintiff's RA (Tr. 573-74). On October 25, 2010, Plaintiff returned for medication refills and PMA had still not been able to obtain updated records from Healthstar Physicians (Tr. 572).

## III.    ALJ'S FINDINGS

### A.    Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**B.      ALJ's Application of the Sequential Evaluation Process**

At step one of this process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since December 21, 2007, the alleged onset date (Tr. 12).  At step two, the ALJ found Plaintiff had the following severe combination of impairments: elevated rheumatoid factor, fibromyalgia, degenerative disc disease, chronic obstructive pulmonary disease, obesity, an affective disorder, and an anxiety disorder (Tr. 12).  The ALJ determined this combination of impairments was severe because there was a history of treatment (Tr. 12).  The ALJ considered whether Plaintiff had additional severe impairments of neuropathy, irritable bowel syndrome, or hepatitis C, but found that these impairments were not severe as Plaintiff's diagnoses of these impairments were questionable and there were no records on ongoing treatment that would indicate disabling complications (Tr. 12-13).  At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 13).  The ALJ noted that he considered the listings that were most closely related to Plaintiff's impairments, such as 1.00, 3.00, 12.00, and 14.00, but that Plaintiff had not exhibited the signs, symptoms and findings necessary to satisfy the listing requirements (Tr. 13).  The ALJ discussed at some length his consideration of the "paragraph B" and "paragraph C" criteria as to Plaintiff's mental impairments, but ultimately determined Plaintiff did not satisfy these criteria (Tr. 13-14).  As a result, the ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work which allowed for no climbing of ladders, ropes or scaffolds, only occasional fine manipulation fingering with both hands, no exposure to pulmonary irritants such as fumes, odors, dusts or gasses, the ability to perform simple, routine, repetitive tasks, the ability to adapt to gradual and infrequent changes in the work

14

setting, and the ability to maintain concentration and persistence for simple, routine, repetitive tasks (Tr. 14). At step four, the ALJ found Plaintiff was able to perform her past relevant work as a cashier and a sole proprietor (Tr. 18). Alternatively, at step five, the ALJ found that Plaintiff was 45, a younger individual, on the alleged onset date and, after considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 19). These alternative findings led to the ALJ's determination that Plaintiff was not under a disability as of December 21, 2007 (Tr. 20).

## IV. ANALYSIS

Plaintiff asserts two arguments. First, she argues the ALJ did not properly consider the effects of Plaintiff's fibromyalgia. Essentially, Plaintiff argues the ALJ's credibility decision was flawed because fibromyalgia would cause her to have the degree of pain and fatigue she claimed [Doc. 14 at PageID#: 55-56]. As part of this argument, Plaintiff also argues the ALJ's finding that Plaintiff could return to her past relevant work is not supported by substantial evidence because it does not consider the totality of Plaintiff's impairments [*id.* at PageID#: 57]. Second, Plaintiff contends the ALJ did not properly weigh Plaintiff's mental impairments. Specifically, Plaintiff argues the ALJ did not properly consider and weigh the opinion of Dr. Stanley [*id.*].

### A. Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389,

401 (1971)).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight."  *Id.* (internal quotes omitted).  If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings.  *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility.  *Garner*, 745 F.2d at 387.  The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B. Assessment of Plaintiff's Impairments and Credibility

Plaintiff first argues that the ALJ's decision is flawed because he failed to properly analyze her fibromyalgia [Doc. 14 at PageID#: 55-56]. Plaintiff notes that fibromyalgia is a difficult disease to address in disability decisions, but the evidence shows that Plaintiff suffers from this condition [*id.* at PageID#: 56]. Plaintiff argues that because the evidence supports her diagnosis of fibromyalgia, her complaints of pain and fatigue should have been fully credited [*id.*]. Plaintiff further argues the ALJ's finding that she could return to her past work as a cashier or sole proprietor was not supported by substantial evidence because he did not consider the totality of Plaintiff's impairments [*id.* at PageID#: 57].

The Commissioner asserts the ALJ properly considered Plaintiff's subjective complaints of fibromyalgia because he found the impairment to be severe and assessed Plaintiff's limitations arising from the condition [Doc. 18 at PageID#: 69-70]. The Commissioner notes, however, the ALJ's discussion that Plaintiff did not have the minimum number of trigger points on examination to substantiate a diagnosis of fibromyalgia [*id.* at PageID#: 70]. Nevertheless, the Commissioner argues that if Plaintiff had been properly diagnosed with fibromyalgia, a diagnosis alone does not entitle Plaintiff to benefits [*id.* at PageID#: 70-71]. The Commissioner contends Plaintiff failed to provide objective medical evidence that was in line with the alleged severity of her symptoms and the ALJ properly weighed the evidence to reach the conclusion that Plaintiff's impairments were not of a disabling severity [*id.* at PageID#: 71-72]. The Commissioner argues that the objective evidence of Plaintiff's impairments was generally normal or indicative of mild limitations, Plaintiff's doctors noted some conditions were controlled by medication, and none of her doctors' notes contain any restrictions or limitations on her physical ability [*id.* at PageID#: 72-74]. The Commissioner

asserts the state agency physicians opined that the objective evidence was out of line with Plaintiff's subjective complaints and her complaints were therefore only partially credible [*id.* at PageID#: 74]. The Commissioner further argues the ALJ could consider inconsistencies in the record with regard to Plaintiff's activities of daily living, and the Commissioner contends Plaintiff tried to minimize her activities during the hearing, but other notes in her medical records speak to a greater level of daily ability [*id.* at PageID#: 74-75].

An ALJ must consider "the claimant's allegations of his symptoms. . . with due consideration to credibility, motivation, and medical evidence of impairment." *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989). Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) (ALJ's credibility assessment is entitled to substantial deference).

The ALJ cannot base his credibility finding on intuition, but must give "specific reasons for the finding on credibility, supported by the evidence in the case record," and the reasons must be

"sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the [claimant's] statements and the reasons for that weight." Social Security Ruling ("SSR") 96-7p (1996); *Rogers*, 486 F.3d at 247-48. "Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 863 (6th Cir. 2011).

According to applicable regulations, the ALJ must consider a claimant's credibility in light of all the evidence in the record, including the claimant's own statements regarding the nature and severity of her symptoms, her daily activities, her prior work record, her physicians' medical diagnoses, prognoses, and opinions, her medications and other treatments, and any other relevant factors. SSR 96-7p. The ALJ must consider these factors, but he is not required to devote written attention to each piece of evidence he considers. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Instead, the applicable regulations provide that the ALJ must state the reasons for his assessment of the claimant's credibility, and those reasons must themselves be grounded in the record. SSR 96-7p.

The ALJ noted in his decision that there was no medical record documenting that Plaintiff met the minimum number of trigger points for a definitive diagnosis of fibromyalgia (Tr. 14-15, 18). Nonetheless, he listed fibromyalgia as a severe impairment based on Plaintiff's diagnosis as reported to doctors, but noted that Plaintiff's reported daily activities were not in line with her stated subjective complaints (Tr. 18). At the hearing, Plaintiff complained that her RA and fibromyalgia caused her to have problems sitting or standing, but many of her complaints addressed problems caused by RA, such as her hands swelling, her inability to type or grasp, and her eyesight (Tr. 30-31,

35-36). Plaintiff's claim that her doctors had told her not to lift anything and stay off her feet as much as possible was not supported by the evidence in the record, and Plaintiff had never been told she needed surgery for any physical problems (Tr. 31-32). Plaintiff was on narcotic medication for her pain (Tr. 31).

As to the totality of Plaintiff's impairments, the ALJ noted generally that "[w]hile the claimant alleges limitations and restrictions due to a combination of impairments, the evidence of record does not support a finding of disability. The testimony of the claimant at the hearing with regard to her alleged limitations is not supported by the evidence of record" (Tr. 18). The ALJ more specifically stated that Plaintiff's subjective symptoms attributable to RA were not in line with the evidence in the record that indicated no synovitis, no deformities, generally mild arthritis, and conservative treatment (Tr. 16, 18). Plaintiff had degenerative disc disease, but there was no evidence of stenosis or nerve root impingement (Tr. 18). The ALJ noted that the record indicated a "generally benign clinical presentation as well as minimal findings on objective tests and imaging studies" (Tr. 16). The ALJ considered Plaintiff's obesity in his evaluation, along with her mental health treatment (Tr. 17). He noted Plaintiff never had specific mental health treatment or psychiatric hospitalization and was treated only with medicine from her primary care providers; although Plaintiff stated she could not receive mental health treatment because she lacked insurance, there was no indication Plaintiff had investigated or attempted to use free or low cost mental health services (Tr. 17-18). The ALJ further noted the record indicated that Plaintiff prepared meals, did laundry, drove short distances, shopped in stores, read, watched TV, talked on the phone, and visited with friends (Tr. 18).

Given Plaintiff's conservative treatment records, which do not indicate any severe, disabling

pain, the lack of any physical restrictions imposed by Plaintiff's treating physicians as a result of fibromyalgia, and Plaintiff's reports of her daily activities, I **FIND** the ALJ properly considered Plaintiff's fibromyalgia and the effects thereof, along with Plaintiff's other conditions, when he considered Plaintiff's physical impairments. I further **FIND** that Plaintiff's subjective complaints of pain were inconsistent with Plaintiff's reports of her daily activities and the objective medical evidence in the record. Because Plaintiff's subjective complaints of disabling pain were not supported by the record, I **CONCLUDE** the ALJ's determination that Plaintiff was not fully credible was supported by substantial evidence. Therefore, I **CONCLUDE** the ALJ properly addressed the totality of Plaintiff's impairments and properly assessed Plaintiff's credibility when he determined she could return to her past relevant work.[2]

### C. Opinion of Dr. Stanley

Plaintiff argues the ALJ did not give appropriate weight to the opinion of Dr. Stanley, who opined Plaintiff suffered from agoraphobia, generalized anxiety disorder, and dysthymic disorder [Doc. 14 at PageID#: 57]. Plaintiff asserts the ALJ makes no meaningful analysis of Dr. Stanley's opinion, which stated Plaintiff would have a poor ability to maintain persistence and concentration on tasks for a full workday and work week and had a GAF of 50 [*id.*]. Plaintiff argues the Commissioner cannot disregard the opinion of a consulting physician which was favorable to Plaintiff and the opinion should have been fully credited because there is no contradictory opinion from any other physician or psychologist [*id.*]. The Commissioner argues the ALJ's analysis of Dr. Stanley's opinion was appropriate because he examined Plaintiff only one time, had no treatment

---

[2] In making this argument, Plaintiff does not address the fact that the ALJ alternatively found that work existed in significant numbers in the national economy that Plaintiff could perform (Tr. 19-20).

relationship with Plaintiff, and his conclusions were inconsistent with Plaintiff's conservative treatment, the absence of mental health treatment, and other evidence in the record [Doc. 18 at PageID#: 75-76]. The Commissioner asserts Plaintiff had insurance through June 2009 and could have obtained mental health treatment, Plaintiff reported her depression was well-controlled with medication, and notes from Appalachian Medical Center as to Plaintiff's mental state conflict with Dr. Stanley's more limiting assessment, leading to the conclusion that Plaintiff's mental impairments were not as severe as she claimed [*id.* at PageID#: 76-77]. The Commissioner also argues Dr. Stanley's opinion was based primarily on Plaintiff's subjective complaints and was therefore not proper; in contrast, Dr. Welch's assessment of Plaintiff supports the ALJ's decision [*id.* at PageID#: 77-78].

The law governing the treating source rule is not properly at issue here because the regulations are clear that a "treating source" means "your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1502. Acceptable medical sources are defined in 20 C.F.R. § 416.913(a) and 20 C.F.R. § 404.1513(a) to include licensed physicians and licensed psychologists. Dr. Stanley therefore qualifies as an acceptable medical source pursuant to the applicable regulations; however, he examined Plaintiff only one time and therefore cannot be a treating source. As such, the ALJ was required to consider Dr. Stanley's opinion, but he was not required to give the opinion controlling weight. *See* Social Security Ruling ("SSR") 06-03p; 20 C.F.R. § 404.1527(c); 20 C.F.R. § 416.927. The ALJ stated as follows with respect to Dr. Stanley's opinion:

> [T]he undersigned has considered the opinion of Dr. Stanley and notes that Dr. Stanley's assessment in [sic] based on a one-time

22

examination of the claimant. The Administrative Law Judge has given little weight to Dr. Stanley's opinion because the claimant's treatment has been conservative and limited to medication prescribed by her primary care provider. Further, Dr. Stanley's opinion is not well supported by any other evidence and is inconsistent with the claimant's treatment notes. The undersigned has given great weight to the opinions of the State agency physicians regarding both the claimant's physical and mental impairments because their opinions are supported by medical signs and findings and consistent with the medical evidence of record.

(Tr. 18). In discussing Dr. Stanley's opinion, the ALJ properly considered the factors outlined in 20 C.F.R. § 404.1527 and 20 C.F.R. § 416.927, including the nature, extent and length of the treatment relationship with Plaintiff, the consistency of the opinion with the rest of the record, and how well the opinion was supported. The ALJ considered the fact that Dr. Stanley examined Plaintiff once and had no treatment relationship with her, noted that Dr. Stanley's opinion was inconsistent with Plaintiff's mental health treatment records and the opinions of the state agency physicians, such as Dr. Welch, and determined the opinion was not well supported by the evidence in the record.

In addition, the GAF score of 50, which would indicate Plaintiff suffered from severe impairments, does not give a sufficient reason for affording more weight, as "[a] GAF score represents a 'snapshot' of a person's 'overall psychological functioning' at or near the time of the evaluation . . . '[a]s such . . . [it] is isolated to a relatively brief period of time, rather than being significantly probative of a person's ability to perform mental work activities on a full-time basis.'" *Hedger v. Astrue*, No. 2:10-cv-1026, 2012 WL 468546, at *9 (S.D. Ohio Feb. 13, 2012) (quoting *Martin v. Comm'r of Soc. Sec.*, 61 F. App'x 191, 194 n. 2 (6th Cir. 2003) and *Arnold v. Astrue*, No. 10-cv-13, 2010 WL 5812957, at *8 (S.D. Ohio. Oct. 7, 2010)). There is no indication from the medical records that Plaintiff's mental health over a sustained period was ever severe. Thus, given

23

the contrast between Dr. Stanley's opinion and Plaintiff's conservative mental health treatment and the opinion of Dr. Welch, which was more consistent with Plaintiff's treatment records, I **FIND** the ALJ properly considered Dr. Stanley's opinion and explained his reasons for his determination with respect to Dr. Stanley's opinion. I **CONCLUDE** that after properly analyzing the opinion, the ALJ reasonably determined that Dr. Stanley's opinion was entitled to only little weight.

Accordingly, after reviewing all of Plaintiff's arguments, I **CONCLUDE** the decision of the ALJ was supported by substantial evidence.

## V. CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[3]

(1) Plaintiff's motion for judgment on the pleadings [Doc. 13] be **DENIED**.

(2) The Commissioner's motion for summary judgment [Doc. 17] be **GRANTED**.

(3) The Commissioner's decision denying benefits be **AFFIRMED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).